UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IRA ALSTON,                          :
                                     :
          Plaintiff,                 :
                                     :
V.                                   :   Case No. 3:07-CV-473 (RNC)
                                     :
JASON CAHILL, ET AL.,                :
                                     :
          Defendants.                :

RULING AND ORDER

Plaintiff Ira Alston, an inmate in the custody of the
Connecticut Department of Correction ("DOC") at Northern
Correctional Institution ("Northern"), brings this suit pro se
under 42 U.S.C. §§ 1983 & 1988 alleging violations of his rights
under the United States Constitution and state law.  The case
stems from a physical altercation between the plaintiff and two
correctional officers at Northern.  From February 15 to March 1,
2012, a jury trial was held on the plaintiff's Eighth Amendment
claims, his claim of assault and battery in violation of
Connecticut law, and his claim of retaliation in violation of the
First Amendment.  The jury found for the defendants on all
counts.  Two matters remain pending for decision by the Court.

First, during the trial, I severed the plaintiff's claim
that the defendants violated his due process rights under the
Fourteenth Amendment.  The plaintiff claims that the defendants
violated his right to procedural due process by conducting an
untimely administrative segregation hearing, failing to provide
advance notice of matters that would be addressed at the hearing,

and failing to conduct meaningful periodic reviews of his segregated status.  Both parties have moved for judgment as a matter of law with regard to the due process claim.  For reasons set forth below, I conclude that the plaintiff received constitutionally adequate process and, even if he did not, the defendants are protected by qualified immunity.

Second, the plaintiff has moved for a mistrial, claiming that the defendants inappropriately struck an African-American member of the venire based on her race.  For reasons that follow, I conclude that even if race was a factor in the decision to strike the juror, the defendants have met their burden of showing that they would have struck the juror had race not been a factor. The motion for a mistrial is therefore denied.

I.   PROCEDURAL DUE PROCESS

A.   Facts

The following facts are either undisputed or compelled by the evidence.  On November 12, 2006, the plaintiff had a physical altercation with two correctional officers at Northern, defendants Wilbur Strozier and Miguel Diaz.[1]  At the time of the altercation, the plaintiff was housed in a Security Risk Group

---

[1] The altercation and its aftermath were the focus of the three-week trial.  The plaintiff testified that Strozier and Diaz attacked him; the defendants testified that the plaintiff instigated the fight.  The jury found that the plaintiff failed to prove his claims under the Eighth and First Amendments and state law.  The details of the altercation are not relevant to the claims addressed in this ruling.

Safety Threat Member unit.  Immediately following the altercation, the plaintiff's condition was evaluated by a nurse. He was then escorted to an isolation cell where he was restrained with handcuffs and leg irons, linked together with a chain.  This type of confinement is known as "in-cell restraint status." The plaintiff was kept in that status for approximately two days.

After being released from in-cell restraint status, the plaintiff was detained in punitive segregation, a restrictive status imposed as punishment for violating the Code of Penal Discipline.  On November 21 and 22, 2006, disciplinary hearings were held and the plaintiff was found guilty of assaulting the two officers on November 12.  Each assault conviction carried a 30-day period of punitive segregation, to run consecutively.  See Defs. Ex. H, at 1; Defs. Ex. I, at 1.  In addition, the plaintiff was found guilty of threatening an officer on November 11, for which he was sentenced to 20 days of punitive segregation, see Defs. Ex. E, at 1, and interfering with safety and security on November 11, for which he was sentenced to 7 days of punitive segregation, see Defs. Ex. F, at 3.  Together, these sentences consigned the plaintiff to punitive segregation from November 11, 2006 until February 9, 2007.  While in punitive segregation, the plaintiff accumulated two more disciplinary tickets, and his segregation was extended through March 23, 2007.  See Defs. Ex. J, at 3; Defs. Ex. K, at 1.

On February 7, 2007, the plaintiff received a notice that a hearing would be held to determine whether his "presence in general population represents a threat to the safety and security of the institutional community."  See Defs. Ex. L, at 1.  This is the form of notice the DOC provides when an inmate is going to be reviewed for placement in administrative segregation.  The notice cited the November 12 altercation as the reason for the hearing. The plaintiff was permitted to select an advocate to act on his behalf and to list witnesses to be called at the hearing.  The notice indicated that the hearing would occur on February 9, but the hearing did not occur until February 13.  At the hearing, prison officials relied not only on the November 12 incident but also on disciplinary reports the plaintiff had received while in close custody as the basis for placing him in administrative segregation.  These disciplinary reports, involving threatening conduct by the plaintiff, were not mentioned in the hearing notice.  The plaintiff was placed on administrative segregation status on February 15, 2007.

The Administrative Segregation Program at Northern consists of three phases.[2]  Phase I is the most restrictive and Phase III the least restrictive.  After completing the requirements for one

_____

[2] The Court takes judicial notice of the program summary posted on the DOC website: Northern Correctional Institution Administrative Segregation Program, http://www.ct.gov/doc/lib/doc/pdf/northernascc.pdf.

-4-

phase, an inmate may move to the next phase, and after successful completion of Phase III, he may be considered for return to the general population.  An inmate spends a minimum of 120 days in Phase I, 90 days in Phase II and 90 days in Phase III.  The inmate's placement is reviewed by classification staff every 7 days for the first two months and every 30 days thereafter.  See Administrative Directive 9.4 Attach. B.  In addition, assignment to risk level 5 – the level corresponding to administrative segregation – is reviewed annually.  See Administrative Directive 9.2 § 10(B)(1), http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0902.pdf.

Records of reviews regarding the plaintiff are incomplete. The defendants' evidence shows that the plaintiff was approved for Phase II of the Administrative Segregation Program on March 15, 2007.  See Defs. Ex. L, at 11.  Plaintiff's Offender Classification History Form reflects reviews on June 29, 2007 (the accompanying note indicates he had progressed to Phase III on June 14), November 15, 2007, January 9, 2008, and roughly monthly thereafter.  See Defs. Ex. U, at 2.  In addition, logs of the plaintiff's Risk History show regular reviews of his risk level occurring annually or more frequently.  See Defs. Ex. U, at 50.  While the plaintiff has progressed out of the Program at least once since February 2007, as of the time of the trial, he remained in administrative segregation at Northern.

-5-

B.   <u>Discussion</u>

The plaintiff challenges three aspects of the procedure that placed him in administrative segregation and kept him there. First, he claims that Warden Jeffrey McGill violated his due process rights by failing to provide him with a timely administrative segregation classification hearing.  Second, he claims that defendant Fred Levesque denied him procedural due process by failing to provide adequate notice of the basis for the administrative classification hearing.  Third, he claims that members of the classification committee – defendants McGill, Light and Salius – denied him due process by failing to conduct periodic reviews of his administrative segregation status from the time he was placed there until July 2009.[3]

At trial, I severed these due process claims from the rest of the claims in the case and asked the defendants to file a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.  I did so for two principal

---

[3] In addition to the three challenges discussed in the text, the plaintiff claims that Northern's procedure for appealing an administrative segregation classification decision is constitutionally infirm.  He cites no authority for the proposition that an appeal is constitutionally required and none has been found.  <u>Cf.</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 476 (1983), <u>overruled in part on other grounds by</u> <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) (outlining the procedural requirements for an administrative segregation decision without mentioning appeal). I therefore dismiss the plaintiff's claim challenging the adequacy of his appeal for failure to state a claim on which relief may be granted.  <u>See</u> 28 U.S.C. § 1915(e)(2)(B)(ii).

reasons.  First, there appeared to be no genuine issue of material fact with regard to these claims.  Second, a trial on these claims risked exposing the jury to evidence of the pro se plaintiff's disciplinary history, which would have prejudiced his other claims.  See Fed. R. Civ. P. 42(b).  The parties subsequently filed cross-motions for judgment as a matter of law; defendants' motion also invokes 28 U.S.C. § 1915(e)(2).  See Docs. 286; 296.  I now grant the defendants' motion on the due process claim and deny the plaintiff's.

    1.  Liberty Interest

    To establish a claim for denial of procedural due process, a prisoner must show that he had a protected liberty interest and was deprived of that interest without being afforded the requisite process.  See Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000).  A prisoner seeking to establish a liberty interest must show (1) that the state created a liberty interest through statute or regulation, and (2) that the confinement at issue imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  See Palmer v. Richards, 364 F.3d 60, 64 & n.2 (2d Cir. 2004) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).[4]  The defendants argue that

_____

    [4] Wilkinson v. Austin, 545 U.S. 209, 223 (2005), clarified that the focus of this inquiry is the atypicality prong, not the language of the pertinent state regulations.  However, Wilkinson also confirmed that a liberty interest in avoiding certain conditions of confinement *does* arise from state policies or

the plaintiff cannot show a state-created liberty interest because even if administrative segregation imposes an atypical and significant hardship, Connecticut prisoners have no protected interest in their classification status, as Connecticut prison officials have full discretion to make classification decisions. The plaintiff responds that Connecticut regulations do limit the discretion of DOC officials to assign prisoners to administrative segregation and thus he has a liberty interest in being free from administrative segregation.

For the following reasons, I agree with the plaintiff that if administrative segregation imposes an atypical and significant hardship on a Connecticut prisoner, it implicates a liberty interest.  However, I do not delve into a detailed factual inquiry to determine whether the plaintiff's administrative segregation was atypically harsh because, even if the plaintiff had a protected liberty interest, he was afforded all the process he was due under the Constitution.

a.   *State-Created Liberty Interest*

"A state-created liberty interest 'arises when state statutes or regulations require, in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates.'"  Vega v. Lantz, 596

_____

regulations.  Id. at 222; see also Iqbal v. Hasty, 490 F.3d 143, 162 (2d Cir. 2007), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009).

F.3d 77, 83 (2d Cir. 2010) (quoting <u>Welch v. Bartlett</u>, 196 F.3d 389, 392 (2d Cir. 1999)).  The Second Circuit has held that New York's regulations establish a mandatory predicate for administrative segregation; therefore, New York has created a liberty interest in freedom from administrative segregation.  <u>See</u> <u>Sealey v. Giltner</u>, 197 F.3d 578, 585 (2d Cir. 1999).  Under <u>Sealey</u>, if an inmate in a New York prison experiences atypically harsh confinement in administrative segregation, he must receive due process.  <u>See also</u> <u>Giano v. Selsky</u>, 238 F.3d 223 (2d Cir. 2001) (finding 762 days of administrative segregation was a deprivation of liberty); <u>Giano v. Kelly</u>, No. 89-CV-727(C), 2000 WL 876855, at *3 (W.D.N.Y. May 16, 2000) ("[I]t is clear that DOCS regulations are couched in language that creates a liberty interest.").

The Second Circuit has not addressed whether Connecticut's regulations are sufficiently similar to New York's to establish a protected liberty interest.  I conclude that they are.  Under New York regulations, "[a]dministrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility."  N.Y. Comp. Codes R. & Regs. tit. 7 § 301.4(b) (2012).  Connecticut's Administrative Directive 9.4, Attachment B, lists the "purpose" of administrative segregation as: "Classified as a threat to staff, other inmates or facility

-9-

security. (Requires a hearing prior to placement)." Another
directive defines "administrative segregation" as, "[p]lacement
of an inmate on a restrictive housing status that results in
segregation of the inmate whose behavior or management factors
pose a threat to the security of the facility or a risk to the
safety of staff or other inmates and that the inmate can no
longer be safely managed in general population." Administrative
Directive 9.4 § 3(B). During the required administrative
segregation hearing, the hearing officer must examine relevant
evidence and give reasons in support of his determination. Id. §
12. While New York's regulations are more concise, Connecticut's
also establish that before an inmate is placed in administrative
segregation, a hearing officer must find that he poses a threat
to safety and security.

Further, Hewitt v. Helms, 459 U.S. 460, 474 (1983),
indicates that prisoners have a liberty interest in being free
from atypically harsh confinement when the confinement is
predicated on a determination that the prisoner is a threat. As
the Second Circuit stated in Sealey, "[i]f an inmate is to be
placed in atypical confinement (considering both the conditions
and the duration) after being determined, for example, to be a
threat to prison safety, he should have some procedural due
process surrounding the determination that he poses such a
threat." 197 F.3d at 585 (confirming that this "teaching of

Hewitt" survives Sandin).

Several cases have concluded that Connecticut prisoners have no liberty interest in their classification.  In Pugliese v. Nelson, 617 F.2d 916 (2d Cir. 1980), a case concerning federal prisons, the plaintiffs challenged their classifications, which prevented them from being favorably considered for furloughs, transfers, work releases, participation in community activities and early parole.  The Court emphasized that since those privileges came at the discretion of the Attorney General – they were birds in the bush, not in the hand – the classification did not implicate a liberty interest.  Id. at 923-24.  The Court also quoted a passage from Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976), reasoning that because Congress has given federal prison officials discretion over prisoner classification, prisoners have no entitlement to a classification that allows them to invoke due process.  Pugliese, 617 F.2d at 923.  This logic has since been extended to Connecticut state prisons in the district courts. See Torres v. Howell, No. 3:03CV2227, 2006 WL 1525942, at *16 (D. Conn. May 30, 2006) ("[T]he improper classification of inmates in the custody of the Connecticut Department of Correction does not implicate the inmates' due process rights."); Harris v. Meulemans, 389 F.Supp.2d 438, 441 (D. Conn. 2005) ("Under Connecticut law, the Commissioner of Correction retains discretionary authority to classify prisoners at any security

level.").

At least one recent district court decision and one state appellate court decision have taken this line of cases to apply to administrative segregation.  See Hamer v. Arnone, No. 3:11-cv-279, 2011 WL 2680836, at *3 (D. Conn. July 7, 2011) (as the plaintiff did "not have a protected liberty interest in his classification under federal or state law, he fail[ed] to state a cognizable due process claim based on his transfer to administrative segregation. . . ."); Vandever v. Comm'r of Corr., 135 Conn. App. 735, 742 (Conn. App. Ct. 2012) (It is "a decision within the respondent's discretion to classify the petitioner at the administrative segregation security level.").  These decisions rely on the applicable DOC regulation, which states: "Placement of an inmate on Administrative Segregation shall be at the discretion of the Director of Offender Classification and Population Management in accordance with this Directive." Administrative Directive 9.4 § 12.

While the directive uses the word "discretion," it cabins that discretion by requiring the director to act in accordance with the substantive requirements of Administrative Directive 9.4.  And while the Connecticut Commissioner of Correction may have discretion to classify prisoners, by promulgating administrative directives, he has given prisoners an expectation that they will not be confined to administrative segregation in

-12-

the absence of the substantive predicates contained in the directive.  Therefore, while Connecticut prisoners may have no protected liberty interest in their classification generally, I conclude that they, like prisoners in New York, have a state-created liberty interest in avoiding administrative segregation based on a finding that they pose a danger.

b. *Atypical and Significant Hardship*

For a period of confinement to constitute a deprivation of a liberty interest, it must impose "atypical and significant hardship" as compared to the "ordinary incidents of prison life." Sandin, 515 U.S. at 484.  In 1999, the Second Circuit recognized that it had not definitively settled what conditions comprise the "ordinary incidents of prison life" to which a period of confinement should be compared.  See Sealey, 197 F.3d at 589. The Circuit has provided some guidance since Sealey.  See Kalwasinski v. Morse, 201 F.3d 103, 107 (2d Cir. 1999).  In the context of disciplinary segregation, the Second Circuit's cases appear to require a district court to compare the conditions of confinement at issue with the conditions of confinement for prisoners in the general prison population and, in addition, prisoners in various forms of administrative segregation and protective custody.  See Kalwasinski, 201 F.3d at 107; Welch, 196 F.3d at 393; Brooks v. DiFasi, 112 F.3d 46, 48 (2d Cir. 1997). In Sealey itself, the Circuit noted that conditions of

-13-

administrative confinement at other prisons in the same state and
the frequency and duration of significantly harsh confinements
might be relevant to a liberty claim.  197 F.3d at 589; <u>see also</u>
<u>Kalwasinski</u>, 201 F.3d at 107 ("the frequency and duration of SHU
confinement of prisoners is 'highly relevant' to whether SHU
confinement is atypical of the prison experience. . . .").  Again
in the context of disciplinary segregation, the Court has said
"the extent to which the conditions of the disciplinary
segregation differ from other routine prison conditions" should
be considered.  <u>Wright v. Coughlin</u>, 132 F.3d 133, 136 (2d Cir.
1998).

　　　Thus, under Second Circuit case law, to determine whether
the plaintiff's administrative segregation constituted an
atypical and significant hardship, it appears that his conditions
of confinement would have to be compared with all other
conditions routinely imposed in Connecticut, both at Northern and
elsewhere; in addition, the Court would need to examine how many
prisoners face conditions similar to those the plaintiff has
experienced; and finally, the Court would have to determine how
long the plaintiff was confined to administrative segregation and
decide whether his confinement was of an atypical duration.[5]

---

　　　[5] This factor provides additional challenges in the
plaintiff's case.  The plaintiff was confined in administrative
segregation for several years – well above the 305 days found to
constitute an atypical and significant hardship in <u>Colon v.</u>
<u>Howard</u>, 215 F.3d 227, 231-32 (2d Cir. 2000).  But the plaintiff

This analysis would require receiving detailed evidence from the parties on the conditions throughout Northern and possibly the entire Connecticut correctional system.

It is likely that the plaintiff had a protected liberty interest in being free from the confinement at issue in this case. The plaintiff has submitted an affidavit detailing his conditions in administrative segregation and his previous unit, and Administrative Directive 9.4, Attachment A, recites the provisions and management standards for inmates in each phase of the Administrative Segregation Program. Viewing the information contained in these documents in light of the conditions in New York's Special Housing Units, see, e.g., Palmer v. Richards, 364 F.3d 60, 65 n.3 (2d Cir. 2004), I think the plaintiff's confinement in Northern's administrative segregation program could give rise to a deprivation of a protected liberty interest. I conclude, however, that detailed Sandin review as prescribed by the Second Circuit is unnecessary in this instance because

---

failed to progress out of Northern's Administrative Segregation Program because he continued to accumulate disciplinary reports. In determining the duration of confinement as it bears on atypicality, a court "must focus only on the interval during which Defendant . . . is responsible." Sealey, 197 F.3d at 587; see also Taylor v. Rodriguez, 238 F.3d 188, 196 (2d Cir. 2001) ("the question arises to what extent, if any, Taylor is responsible for the length of his confinement to close custody."). To analyze the duration of confinement, then, the Court likely should calculate the minimum amount of time the plaintiff would need to spend in each phase of Northern's Administrative Segregation Program by virtue of his initial placement.

assuming the plaintiff had a protected liberty interest, he was given all the process he was due under the Constitution.

    2. <u>Process</u>

    As mentioned above, the plaintiff claims that his administrative segregation classification hearing was untimely; he was given inadequate notice of what would be addressed at the hearing; and the classification committee failed to engage in meaningful periodic reviews of his administrative segregation status.  For the following reasons, I find in favor of the defendants on all three claims.

    a. *Timeliness of the Hearing*

    Under <u>Hewitt</u>, prison officials are obligated to provide an inmate with at least an informal hearing "within a reasonable time after confining him to administrative segregation."  459 U.S. at 472.[6]  The plaintiff contends that he was placed in administrative segregation without a hearing on November 22, 2006, and did not receive a classification hearing until February 13, 2007, approximately 90 days after he was first segregated. He argues that such a long delay constitutes a due process violation.  At oral argument, he alternatively claimed that his

---

    [6] Prior to the Supreme Court's decision in <u>Sandin</u>, the Second Circuit had found that delays as brief as seven days could support a claim.  <u>See</u> <u>Gittens v. LeFevre</u>, 891 F.2d 38, 41 (2d Cir. 1989); <u>see also</u> <u>Soto v. Walker</u>, 44 F.3d 169, 172-73 (2d Cir. 1995) (hearing 15 days after segregation states a due process claim); <u>Russell v. Coughlin</u>, 910 F.2d 75, 78 (2d Cir. 1990) (ten-day delay violates due process).

punitive segregation ended and his administrative segregation
began on January 19, 2007, and that the DOC was required to
provide him with a hearing by that date.[7]  The defendants contend
that before the plaintiff's initial period of punitive
segregation ended, it was extended to March 23, 2007, based on
new disciplinary reports; thus, they say, the hearing on February
13, 2007, occurred while he was still in punitive segregation and
well before he was placed in administrative segregation.  The
evidence confirms that the plaintiff was never in administrative
segregation without a hearing and, accordingly, his claim fails.

The evidence shows that the plaintiff received 60 days'
punitive segregation for the altercation on November 12, 2006.
See Defs. Ex. H, at 1; Defs. Ex. I, at 1.  But he also received
40 days' punitive segregation for earlier incidents.  See Defs.
Ex. E, at 1; Defs. Ex. F, at 3.  These sanctions placed him in
punitive segregation until February 9, 2007.  Two later
violations extended his term of punishment to late March 2007.
See Defs. Ex. J, at 3; Defs. Ex. K, at 1.  Thus, the February 13
hearing did take place while he was still in disciplinary
confinement as the defendants contend.  Given the evidence in the

_____

[7]    If an inmate is convicted of assault on a DOC employee,
he may be sanctioned with a maximum of 30 days' punitive
segregation, and he "shall be reviewed for placement in
Administrative Segregation prior to the completion of the
punitive segregation sanction."   Administrative Directive 9.5 §
10(B)(1), http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0905.pdf.

record, it must be concluded that the plaintiff's due process
rights were not violated with regard to the timing of the
hearing.[8]

> b.   *Adequacy of Notice*

The Plaintiff claims that the hearing notice he received was
inadequate because it stated only one basis for the proposed
administrative confinement – the November 12 incident – but a
second basis – disciplinary reports he received for threatening
staff – was disclosed at the hearing.  He alleges that the
defendants' failure to provide him with advance notice of their
intention to rely on the disciplinary reports prevented him from
adequately preparing for the hearing.  The defendants respond
that the notice was adequate under the low standard set forth in
Hewitt.  I agree with the defendants that the plaintiff received
"some notice" of the basis for the hearing, as Hewitt requires,
and that the defendants' failure to provide advance notice
regarding the disciplinary reports was not a constitutional
violation.

Hewitt provides, "[a]n inmate must merely receive some
notice of the charges against him and an opportunity to present

---

[8]   The plaintiff did not experience any period of
segregation without a hearing, as a hearing on his disciplinary
violations was held on November 22, 2006.  The plaintiff's
complaint alleges that the November 22 hearing was inadequate
because he was not present.  At oral argument, however, he
confined his claim to the February 13 hearing and subsequent
reviews.

his views to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476. A "brief summary of the factual basis for the classification review" suffices, Wilkinson, 545 U.S. at 226, and due process does not require that the inmate receive "an exhaustive list of grounds believed to justify placement" and a summary of all evidence that will be used against him. Id. at 219.

If an inmate is to be confined for disciplinary reasons, the notice standard is higher. Benjamin v. Fraser, 264 F.3d 175, 190 (2d Cir. 2001). In that case, "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." Wolff v. McDonnell, 418 U.S. 539, 564 (1974). Plaintiff emphasizes in his brief that Kim v. Hurston, 182 F.3d 113 (2d Cir. 1999) holds, "if an initial ground [for placement] is changed, the person deprived of liberty is entitled to know the new ground," id. at 119; however, that case relied on the procedural due process requirements set out in Wolff, not those in Hewitt, id. at 120. And to the extent Taylor, 238 F.3d at 192, suggests that the Wolff standard should be applied in the administrative segregation context, it is not controlling in light of Wilkinson. Wilkinson makes it clear that when an inquiry draws heavily on the experience of prison administrators and implicates the safety of staff and inmates, the procedures

set forth in <u>Hewitt</u> are more appropriate than those in <u>Wolff</u>. <u>Wilkinson</u>, 545 U.S. at 228-29.  An administrative segregation classification hearing is precisely that sort of inquiry.

The notice given to the plaintiff before the hearing was adequate under the <u>Hewitt</u> standard.  He was notified of the incident "leading to consideration for [administrative segregation] placement. . . ."  <u>Wilkinson</u>, 545 U.S. at 226. While he did not receive advance notice of the second basis for his confinement – the disciplinary reports for threatening staff – this additional basis does not raise concern about "the inmate[] being mistaken for another or singled out for insufficient reason."  <u>Id.</u>  The plaintiff was permitted an opportunity for rebuttal at the hearing.  That he may have been denied an opportunity to "marshal the facts and prepare a defense" does not mean that he was deprived of his right to due process.

c. *Periodic Review*

Finally, the plaintiff alleges that prison administrators failed to conduct meaningful periodic reviews of his administrative segregation status as required by the Constitution.  He contends that "program advancement reviews" – reviews to determine whether an inmate should proceed to Phase II or Phase III of the Administrative Segregation Program – are not "the periodic reviews envisioned by the Supreme Court . . . and

-20-

the Second Circuit . . . ."  I disagree and conclude that these

reviews are adequate to satisfy the procedural due process

requirements set forth in <u>Hewitt</u>.

The Supreme Court has stated:

> [A]dministrative segregation may not be used as a
> pretext for indefinite confinement of an inmate.
> Prison officials must engage in some sort of periodic
> review of the confinement of such inmates.  This review
> will not necessarily require that prison officials
> permit the submission of any additional evidence or
> statements. The decision whether a prisoner remains a
> security risk will be based on facts relating to a
> particular prisoner - which will have been ascertained
> when determining to confine the inmate to
> administrative segregation - and on the officials'
> general knowledge of prison conditions and tensions,
> which are singularly unsuited for "proof" in any highly
> structured manner.

<u>Hewitt</u>, 459 U.S. at 477 n.9.  Northern's Program Reviews

adequately guard against the danger of indefinite confinement.

The review sheets in Defendants' Exhibit U contain reasons for

the committee's recommendation to approve or deny advancement to

the next phase, and they reference recent disciplinary reports,

indicating that the committee takes current information into

account.

The plaintiff urges that these reviews are inadequate

because they do not directly address whether an inmate in Phase I

or Phase II should be in administrative segregation at all – they

only address whether he should move to the next phase.  I

disagree.  Courts "must accord substantial deference to the

professional judgment of prison administrators, who bear a

-21-

significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The decision to structure Northern's administrative segregation program in phases is within the administrators' discretion. An inmate who remains free of disciplinary reports will progress out of administrative segregation, as the plaintiff has done at least once since filing this lawsuit. While the decision in Hewitt may envision direct review of an inmate's administrative segregation status, it does not indicate that direct review is necessarily required. And as defendants note in their brief, while the Circuit held that direct review hearings were necessary in Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000), the regulations at issue there required that an inmate be released when reasons for placement ceased to exist. There is no such requirement in Connecticut's regulations.

The plaintiff's records indicate that annual or semi-annual "regular reviews" of his detention status were performed by the warden at Northern. See Defs. Ex. U, at 50. As plaintiff discusses, annual reviews are likely too infrequent to satisfy the requirements of Hewitt. See, e.g., Toussaint v. McCarthy, 801 F.2d 1080, 1101 (9th Cir. 1986) (abrogated in part on other grounds by Sandin v. Conner, 515 U.S. 472 (1995)) (finding annual reviews insufficient). However, as the committee's periodic

program advancement reviews are adequate, the plaintiff received
all the process required under Hewitt.[9]

### 3.  Qualified Immunity

The defendants argue that even if the plaintiff had a
liberty interest in avoiding administrative segregation, and even
if he received inadequate process, they are protected from
damages liability by the doctrine of qualified immunity.  I
agree.

"Qualified immunity shields government officials from civil
suits for damages 'insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a
reasonable person would have known.'"  Higazy v. Templeton, 505
F.3d 161, 169 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982)).  A right is clearly established if (1) it
was defined with reasonable specificity at the time of the
defendants' actions, (2) the Supreme Court or Second Circuit had
affirmed the rule, and (3) a reasonable defendant would have
understood from the existing law that his conduct was unlawful.
Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998).

Even if it was clearly established in 2007 that the
plaintiff had a protected interest in being free from
administrative segregation, a reasonable defendant would not have

---

[9] There are gaps in the records of the plaintiff's periodic
reviews, but none exceeds four months.  The plaintiff does not
suggest that more frequent reviews are required - he challenges
the nature of the reviews, not their frequency.

known that the notice, hearing and periodic reviews provided to the plaintiff were constitutionally inadequate.  As discussed above, Hewitt only requires "some notice" of the basis for the hearing, and Wilkinson rejected a district court proposal that would have required disclosure of all bases for the hearing in advance.  The defendants could reasonably believe that the plaintiff was still in punitive segregation at the time of his February 13 classification hearing, as in fact he was; therefore, the hearing was timely.  And neither the Second Circuit nor the Supreme Court has spoken about the required frequency of periodic reviews, or whether the reviews must evaluate the inmate's placement in administrative segregation, as opposed to his progression through an administrative segregation program.  Therefore, even if I were to find that the plaintiff's rights were violated, he could not recover damages from the individual defendants, as they are protected by qualified immunity.

I therefore find in favor of the defendants on the plaintiff's claim under the Due Process Clause.

II.  PLAINTIFF'S BATSON CHALLENGE

A.  Facts

Jury selection in this case was held on February 14, 2012. Over the course of the day, the venire was narrowed to fifteen eligible jurors; the parties had no cause to challenge anyone in this group of fifteen.  The parties exercised three peremptory

challenges each, on separate paper forms.  The defendants used
one of their strikes on Juror 622, the only African-American in
the group of fifteen.  When it became apparent that the
defendants had used a strike to remove Juror 622, the plaintiff
challenged the strike under Batson v. Kentucky, 476 U.S. 79
(1986).

In response to the plaintiff's challenge, defendants'
counsel, Assistant Attorney General Terrence M. O'Neill,
expressed concern that Juror 622 had not been forthright during
the voir dire.  Juror 622 had stated that she worked for a teen
pregnancy program.  Mr. O'Neill stated that he and his clients
were familiar with the teen pregnancy program and that the staff
at the program interact with law enforcement on a daily basis.
Mr. O'Neill explained that parole officers, probation officers
and juvenile officers visit the program frequently for reasons
related to problems affecting clients of the program.  While many
of the voir dire questions had focused on jurors' experiences
with, and opinions of, law enforcement personnel, Juror 622 had
not volunteered a response to any of these questions.  Mr.
O'Neill described the jury selection as "a four-hour debate about
the role of law enforcement in our community and experiences that
individuals have had and how those experiences have shaped their
opinions about the society," and he expressed concern that Juror
622, despite being "in the middle of that debate every day," had

"never even acknowledged that she had contact [with law enforcement]."  See Jury Selection - Transcript Excerpt, Doc. 321 at 4-5.  In response to a question by the Court, Mr. O'Neill stated that Juror 622's conduct made him think she might have an undisclosed bias against law enforcement because she had not been forthcoming in response to numerous questions that naturally called for information about her frequent interactions with law enforcement personnel.  See id. at 9.  In the course of his comments, Mr. O'Neill also touched on a second factor: noting that Juror 622 works with troubled youth, he pointed out that the plaintiff "is very much a troubled youth and [that] led [the plaintiff] to where he is today."  Mr. O'Neill stated that race was not a factor in the decision to strike Juror 622.  He pointed out that he, his co-counsel, and five of the defendants had jointly decided which jurors to strike, that three of the defendants are African-American and that two of these defendants had participated in the joint decisionmaking that led to the strike of the juror.

I credited Mr. O'Neill's explanation for the strike. However, after I proposed calling Juror 622 to the sidebar for further questioning concerning her interactions with law enforcement, another attorney for the defendants, Assistant Attorney General Steven R. Strom, added the following comments concerning the decision to strike the juror:

> [T]his is based on many years of experience.
> The question that Mr. Alston proposed to you was
> propounded to the jury a number of different times and
> she remained entirely silent.  The problem is -- and
> this is from personal experience with a jury that our
> office had with Magistrate Judge Garfinkel -- an
> African-American member of the community remained
> silent, sat on the jury, and then there was a mistrial,
> and at the end of the mistrial, Judge Garfinkel
> interviewed the jurors and came out and was considering
> holding one of the jurors either in contempt or
> considering perjury charges against the juror because
> when they were in the jury room, the juror who remained
> silent throughout the voir dire, ended up on the jury
> and said, if you lived in my community, you know, the
> police always have an agenda.
> So the concern is the lack of information and the
> lack of honesty.

The plaintiff responded that Mr. Strom had made "a blanket statement about African [American] jurors being dishonest and not that juror right there [Juror 622] being dishonest."

I denied the plaintiff's Batson challenge, reiterating that I credited the defendants' race-neutral explanation for the strike provided by Mr. O'Neill.  The following morning, however, I expressed concern about Mr. Strom's comments regarding the juror in Judge Garfinkel's case and asked the defendants to brief their position under dual motivation analysis.  The defendants complied, and on February 22, 2012, the plaintiff filed a motion for a mistrial based on the defendants' strike of Juror 622.

B.   Discussion

The Equal Protection Clause of the Fourteenth Amendment forbids attorneys from using peremptory challenges to exclude jurors because of their race.  See Batson, 476 U.S. at 89.  The

-27-

Supreme Court has developed a three-part process for evaluating Batson challenges.  First, the party claiming a violation – here, the plaintiff – much make a prima facie showing that a peremptory challenge was exercised based on race.  Second, if the plaintiff has established a prima facie case, the party that exercised the challenge must offer a race-neutral basis for striking the juror. Finally, the trial judge must consider the parties' submissions and determine whether purposeful discrimination has been shown. Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003).  When a party shows that race was a substantial motivating factor in the exercise of a peremptory challenge, the other party may invoke "the affirmative defense of showing that the same challenge[] would have been exercised for race-neutral reasons in the absence of such partially improper motivation."  Howard v. Senkowski, 986 F.2d 24, 30 (2d Cir. 1993).  This defense requires a court to engage in "dual motivation analysis."

The defendants do not argue that the plaintiff failed to make a prima facie showing of race discrimination and I conclude that such a showing was made.  The burden of establishing a prima facie case is not onerous; it is met by producing "evidence sufficient to permit the trial judge to drawn an inference that discrimination has occurred."  Johnson v. California, 545 U.S. 162, 170 (2005).  The plaintiff is African-American and the defendants struck the only African-American remaining on the

-28-

panel.  Some courts have found this fact sufficient to establish
a prima facie case in appropriate circumstances, while others
have found it insufficient.  See Cousin v. Bennett, 511 F.3d 334,
338 (2d Cir. 2008) (collecting cases).  I conclude that in the
circumstances of this case, defendants' strike was sufficient to
establish a prima facie case.

Mr. O'Neill provided a race-neutral reason for the  decision
to strike Juror 622: he and his clients reasonably believed that
this juror had failed to disclose that she has frequent contact
with law enforcement at her workplace, and that her failure to
disclose this despite being given a number of opportunities to do
so (and after being instructed to err on the side of disclosing
more information rather than less) could indicate a bias against
the defendants.  This race-neutral reason more than met the non-
moving party's "very low" burden.  See McKinney v. Artuz, 326
F.3d 87, 98 (2d Cir. 2003).

The plaintiff contends that Mr. Strom's subsequent comments
concerning the juror in Judge Garfinkel's case permit a
reasonable inference that race was a factor in the decision to
strike Juror 622.  The plaintiff's concern is understandable.  I
conclude, however, that his motion for a mistrial should be
denied.  The defendants have carried their burden of showing that
they would have struck Juror 622 for race-neutral reasons in the
absence of the allegedly improper motivation.  The defendants'

race-neutral explanation for striking Juror 622, as articulated by Mr. O'Neill, was entirely credible.  The reasons given for the strike were clearly relevant, see United States v. Taylor, 92 F.3d 1313, 1328 (2d Cir. 1996), in that the defendants are employed by the Department of Correction and juror bias against law enforcement would therefore be prejudicial to them.  The juror's work on behalf of troubled youth, as noted by Mr. O'Neill, was itself a sufficient basis for the strike.  The plaintiff's motion for a mistrial is therefore denied.

III. CONCLUSION

The defendants' motion for judgment [doc. 286] is granted, and the plaintiff's motion for judgment [doc. 296] is denied. The plaintiff's motion for a mistrial [doc. 298] is denied.  The Clerk will enter judgment for the defendants.

So ordered this 10th day of August 2012.

/s/ RNC
Robert N. Chatigny
United States District Judge

-30-